The first case for argument is case 24-3601, 24-3602, 24-3604, 24-3605, 24-3606, and 24-3607. United States v. Don White, Jr., Raheem Houston, Diegus Hall, De'Bell Lewis, and Simeon Hall. Mr. Breedlove? Good morning, Your Honor. Good morning. Good morning. May it please the Court? Counsel. The public trial right is among the most fundamental guarantees in our Constitution. It protects every citizen's right to be tried openly and publicly. My clients, and I say clients, though my client is Diegus Hall, but we all worked as a team, and I thank my co-counsel for their assistance during trial and the obvious 28-J adoptions. My client's family is here, as they were for every part of the trial except voir dire, that important and constitutional part, its own discrete part of the Constitution where we are selecting who will sit in judgment of our citizens, in this case, Diegus Hall and his co-defendants. They're here today, but they weren't allowed to be there during the voir dire. As an initial matter, should we be considering this as a complete closure or a partial closure? It is a complete closure, Your Honor. It is unequivocally a complete closure because a closure is determined not by how long the closure occurred, but by who was excluded. And in this case, everyone was excluded. There was no public allowed in the courtroom during voir dire. Does the live streaming matter at all? And why not, what case do I look to to say it doesn't matter? That law is undeveloped because live streaming is new, right? So there's not a lot of case law in that. I watched the Super Bowl this year, okay? If I came before you and said I attended the Super Bowl, I would be a liar, right? Watching something on live stream is not the same as being there. The people that are listening to the live audio are not getting the same experience as the people who are here, the civics class that's here with the wonderful teacher that brought them to this. That is what an open courtroom is, not live streaming. If that was the same thing, these students wouldn't be here. They'd be watching. But even in a complete closure situation, as I understand the law, if there's an overriding interest, the district court may close the courtroom. That's correct. Why weren't the practical kind of constraint? I mean, look around here. The district court was dealing with more. We don't have jurors here. Why isn't that an overriding, plus the security interest at least is put forth by the district court, why isn't that enough to be an overriding interest when combined with sort of the live stream? And I don't know if it's fair to do a totality analysis and say this was good enough. Because there were alternatives, and that's the third step of the Waller test. You look at the alternatives. We had the trial open, and so if we had conducted the veneer in panels of 14, we very obviously could have done that. Now, the district court considered that, right? What was the basis for rejecting that proposal? They considered it after the fact, and that was considered in his written ruling denying the post-trial motions. And he said, well, they did such an effective job during voir dire, talking about one juror's response with other jurors that they got a better voir dire because of what was done. That seems reasonable, doesn't it? I mean, that's an interactive process. It's certainly an interactive process. Did it benefit our clients in some way? Certainly. But that is not the standard. Convenience, it was done essentially for convenience. It made it a faster process. I guess maybe necessity is overstating it, right? But I mean, there were certainly countervailing concerns that the district court had. There were. And unfortunately, the district court ended up cutting into one place that it can't, and that's the right to a public trial. They could have cut in any number of other ways. The court had ruled that there wasn't going to be a severance of the defendants as a matter of law, but it was going to be severed as a matter of convenience. They couldn't try all 13 at the same time, right? So we had several separate trials. Well, if that was the concern, that allowed each of those trials to be smaller. If we had had three, if there were multiple trials of three defendants at a time, it could have been open. And so there are a lot of alternatives, and that's the important part. Even if the court believes that the interests were sufficiently overriding, which we don't concede they are because I don't believe that they are, the remedies that were available to the court, the court did not avail itself of. And Presley v. Georgia, the United States Supreme Court case, makes it very clear that the onus is on the trial court to protect that right. And they talk about press citizen or press enterprise where both parties wanted it closed, and that's still not allowed. It is the trial court's job to protect that. So we discussed the trial court's justification for doing what it did. You said that was post-trial. I don't recall what the nature of the discussion was before trial. Was this a, quote, unquote, litigated issue by the defendants? It was brought up during pretrial, and I filed a brief that my co-defendants all joined that evening on the eve of Waudeer, and we decided it the next morning, and the judge decided it the next morning. Ruled from the bench at that point? That's correct, Your Honor. At this point, my time is up. If you have more questions, I don't want to steal much from my colleagues, unfortunately. You won't be stealing. I do have, I want to follow up a little bit on the role of the live stream. Certainly. I know you're probably relying on our Kate Thompson case for the description of the difference between a partial and a complete closure. I'm not sure that live stream was an option at the time of that case. Does that give us any ability to sort of look at the new technologies? I agree. I understand your point. The panel members cannot see that there's a public there, but certainly the public can at least watch from down the hall. Is that something that we should be evolving with and at least factoring in when we assess what it means to be a complete closure in the day of live streaming? Certainly. I think there are a lot of changes in the practice of law. We're appearing in court by Zoom now. Some places are having trials by Zoom. So those things are coming. But when we talk about the Constitution, when we talk about the right to have an open and public trial, the Supreme Court cases make it clear. It's not just for people to be able to watch. It's for the jury and the judge and the prosecutor to know that there are people watching. Were the jury panel members, the veneer panel members, told that there was a live stream of folks down the hall watching them? I don't recall, Your Honor. Do you think that would matter? I don't think it would. Because, again, there is just such a difference between being live and in person and being on a live stream down the hall. Well, from the standpoint of the potential juror, do you think it matters if the court would have said, hey, it looks like there are no members of the public here in this room. But, in fact, down the hall, there's a live stream, and they're watching from multiple cameras around the courtroom. Would that have mattered? I don't think so, because the psychology of having somebody in the room with you, right? That's why we have the right to confront and cross-examine witnesses in the courtroom, because they have to sit and swear an oath and be in front of the judge watching them and the attorneys watching them and all those sorts of things. Do you think that dynamic is the same with a witness as it is with the public during Vaudire? I think the underlying psychology is the same, the underlying purpose of those things, to make sure that everybody knows this is open. This is open to the public. There are people there that are watching you. They are respecting you. You are watching them. That's the whole purpose of having an open courtroom. And when we decide that convenience and speed override the Constitution and allow us to do these things in a different way, I think that's a very dangerous path to go down. Why would we need open courts at all? I mean, there's always going to be security issues, right? We all have to go through security to get into the courthouse. So this is kind of an interesting question because it is framed in constitutional argument because it is a constitutional right, and yet we're reviewing the district court's decision on partial complete closure for abuse of discretion, which is kind of an interesting challenge. Where would you say the abuse of discretion is here? The judge abused his discretion by closing and deciding that live stream was equal in quality and kind to having the public there and deciding that having plainclothes government employees present in the courtroom, that's not the same as the public. Because if we take that argument to its conclusion, the government could have so many plainclothes employees at every trial sitting in the courtroom that the public could never show up. If we were to conclude that this was a complete closure rather than a partial closure, would we be creating a circuit split with the fourth, fifth, and sixth circuits? I don't believe so, Your Honor. Those circuits which are addressed in the government's brief and they cite the differences that are going on there, I don't think it creates a circuit split because the cases that they cite are facts, are different. I think because closure of a courtroom is such a fact-specific situation, which is why they need to make the fourth part of the Waller test, is making sure you have detailed findings. Did they involve live streaming? I believe some of them did, yes, Your Honor. But again, even just being in a different courtroom, in a different courthouse, and having five defendants versus one defendant, all those things go into why Waller requires the very specific findings. And so I don't think you run the risk of creating a circuit split on this issue. If it's such a highly factual, you know, the facts matter so much, how do you get to an abuse of discretion when there were so many obvious challenges that the district court faced here? I mean, going back to Judge Kelly's, I mean, that's an odd standard here when you're making a constitutional claim. But if it applies, you've got a much harder case, I think. I think the obvious errors, there are also a number of obvious solutions, right? The obvious solution is a smaller veneer panel. That's very simple. It happens all the time. There's no reason to do the entire veneer at once. Well, there were reasons stated by the district court, right? I mean, your suggestion is they're not overriding. Those do not override the Constitution. Absolutely. I mean, because you could go either direction, right? It might be, as defense attorneys, we would love to have one-on-one voir dire with every juror for an hour before every trial before we decide. But that's obviously not going to happen. What if there was room for one person in the courtroom? So the defense tables are full of attorneys and assistants, and so is the prosecution. There's room for one space in the back of the room. Is that open? And then there's the spillover into the live stream room. What do we do there? It depends on the reason why there's only one space. If the reason why there's only one space left is because it's been filled up with government employees or they've blocked it off for jurors, then I think perhaps not, because there would have been ways to allow other people in. So then you just turn to the alternative options. The reasonable alternatives that the district court considered? Is that what you're saying? Yes. I mean, again, dividing the trial into more trials, dividing the veneer into smaller panels, adjusting where people were sitting. And again, I want to be clear, Judge Locher had a very difficult job to do with court staff and court personnel trying five defendants at the same time who were going to be shackled. And that's not a very big courtroom. It is not. But that's a great point, Your Honor, because they could have had it in a different courtroom, and that happens sometimes. There's not a bigger courtroom in Davenport, is there? No, but they could have made arrangements for a larger location. Again, that presents its own set of logistical challenges, but logistical challenges should never trump the Constitution. Nothing should trump the Constitution. In this country, nothing does trump the Constitution. It is supposed to be an open trial, no matter what. If there are no further questions, thank you, Your Honor. Thank you. Good morning. My name is Rocky Cole, and I represent the appellant Rahim Houston. I'm going to focus the bulk of my argument on the conspiracy issue in this particular case related to the alleged hearsay statement that we make, and I will spend some time on the aiding and abetting attempted murder enhancement in connection with this case. As this court knows, it's well established that hearsay is not permitted to prove the truth of the matter asserted. Of course, there's a well-established rule to that, exception to that rule, and that is the conspiracy hearsay exception, which is not considered hearsay. The goal post for this court to consider in connection with this issue was a hearsay statement made in the jail between CP, a cooperating witness, and Michael Cross, one of the alleged members of this particular conspiracy. The goal post for this court to consider are, was this simply gossip in jail about what had already happened, or was this something that materially advanced the conspiracy in some way? The government briefing has indicated that the hearsay statement at issue, which was, it was the gays. This involved the alley shooting, one of the most significant actions in connection with this case, in which there were several shots fired. The question is, why? That hearsay statement in the jail answered the why question between Mr. Cross and CP. Was that just about the only evidence of the why in the trial? Yes, in terms of a direct link. Now, in the government's brief, they argue, well, you know, the shooting occurred. We can kind of make inferences. But in terms of a direct tie, that was a critical piece of evidence as to that particular issue. So the issue is, is that we don't quibble that people can't commit crimes in jail, or that you can't commit conspiratorial acts in jail. It happens all the time. There are gangs that do drug dealing and coordination and witness intimidation. It happens. The problem for the government in this case is that the record is, for the most part, completely silent on any gang related activity while CP and Mr. Cross were actually in jail. Nothing supports their finding that, in fact, they were actively engaged. We agree that conspiratorial activities can occur when someone is in jail. If, in fact, those actions have actually occurred. What about the testimony? I thought it was from CP. I thought that he said, yes, it is important to keep each other apprised of what's going on for my own safety, because the concerns about your safety in these situations don't stop at the jailhouse door, that he still had those. What about that testimony? They don't, but those were carefully elicited by the government, and it was essentially historical recitation. The other piece of it is that CP and Michael Cross remained incarcerated in the jail and were no longer actively participating in the conspiracy. There's no record of that. Now, I know there's case law that says you have to have an affirmative withdrawal, but in this particular case, there's no evidence that they were actively involved. And I would argue, and we've argued throughout, that that safety-related justification was one that was primarily advanced by the government after the fact and not actually offered by CP in terms of the why question. I have a specific quote as to why that was offered. And the other piece of it is that there's nothing from Mr. Cross as to why that was actually being advanced. So in terms of the declarant in this case, Mr. Cross, there's no indication that he included that express proviso. Hey, look out, watch out. It was basically just jail gossip in terms of like, hey, what happened here? And it's a historical recitation. That's well-established case law in this case. Fortunately, we're not making any new law in this case. We're just asking you to apply well-established law related to historical recitation. And the rule is clear, and that is identified in the 1949 case of Krulwich. If this court expands this so far as to allow kind of keeping abreast of jailhouse or conspiracy activities, as an exception, the rule effectively becomes meaningless. The United States has brought up Jefferson, where you have active communication about what's going on. We would argue that the Jefferson case is different because that did not involve the custodial context in which they're out and about, they're outside, they're actively engaged in the conspiracy. There's no active engagement here. Do you think you need the active engagement of the conspiracy in order to warrant the admission of this co-conspirator? Yes, because it has to be in furtherance of. If there's not an action, it doesn't advance the conspiracy, yes. You need to have a – it has to advance the conspiracy. In this particular case, there's no actions in jail to that. There was no record that these activities continued in terms of jailhouse calls or anything else in connection with this case. So we believe that there was error admitting this, that it is significant enough error to warrant reversal. I briefly want to cover the aiding and abetting issue of the attempted murder. The key issue for that is – and I'll ask the government to answer this – is what facts and what actions did Mr. Rahim Houston take before this spontaneous shooting? The Roseman case, in order for aiding and abetting liability to attach, requires advanced knowledge of what was going on and, by definition, that could not occur in this particular case because everyone agrees, including the government, that no one expected law enforcement to show up and that there would be a spontaneous shooting, which also connects to the hearsay problem in terms of the gaze. Are there any other questions? I see none. Thank you.  May I please court? Opposing counsel? I'm here to discuss the sufficiency of the evidence as it relates to count one, the conspiracy to engage in racketeering activity. In short, the government's case in this particular case failed to prove the existence of an enterprise or any activity that would meet the definition of recall conspiracy. Simply put, what the evidence showed was there was a group of men who grew up in Rock Island, Illinois, on 5th Street, and that these people all grew up together, some of them related, and they liked to commit criminal activity for their own self-gain and self-interest. So if you look at the elements of that particular crime and what they were required to prove, they had to prove five things. The government had to prove that the enterprise existed, that the enterprise affected interstate commerce, the defendant associated with the enterprise, that two or more persons came to an understanding of participating in the affairs of the enterprise, directly or indirectly, through a pattern of racketeering activity, and the defendant voluntarily joined and intentionally joined in the understanding. So in this particular case, we had 14 men who were charged with recall conspiracy. The group that was alleged was the 5th Street Gang, also known as Zone 5th. The government alleged that there were various shootings, attempted murders, and drug dealing that occurred over the course of approximately 20 years, and they alleged that all these activities were related to the recall conspiracy, and that's going to be important, that these activities were related to the recall conspiracy or the enterprise. Now, so the government theory is that this gang was comprised of individuals that were associated, in fact, not a legal entity. So therefore, they were required to show evidence of ongoing organization, formal or informal, and evidence that the associates functioned as a continuing unit. Now, I go to Turkic. In Turkic, it was a Supreme Court case from 1981. They say it's the goal of RICO was to bring enhanced sanctions and new remedies to deal with the unlawful activity of organized crime, and it cautions that the existence of enterprise remains a separate element the government must prove at all times. So the jury was instructed in instruction number 14 about the elements the government was to prove. They were to prove a common or shared purpose, continuity of structure and personnel, and ascertainable structure distinct from that inherent to the pattern of racketeering activity. Now, that's the Crenshaw standard. Separately, we have the Boyle standard, and the government is going to take the position that the Boyle standard does not require the third element to be made. The Boyle case is an interesting case, because that case doesn't say that you're not allowed to give that instruction. What that case simply said was that while the defense requested it, it was not required. So if you're saying that then it should have been given, how is it an abuse of discretion for the district court not to or to? Like, what is your concern about this particular jury instruction? Well, the government's position is going to be that underneath the shot, they don't have to prove that element, so we can't argue that anymore. And the real issue then becomes that that's not an element of the case that was given that is not in the statute, as we had in the Shod case. What that was is a definition. The court has jurisdiction or has, I should say, discretion to give different definitions to different terms. Just to be clear. I'm sorry. I was just going to clarify that you did get the instruction that you requested. We did. Yeah, and so the issue is going to be over whether or not. So is the argument sufficiency, then, I take it, on the distinctiveness? It is. Now, I would argue, too, though, that it doesn't really matter whether the court considers that to be something the government has to prove or not, because the government's case fails in the first two elements as well. If you look at the first two elements alone, the common or shared purpose and continuity of structure and personnel, we look at Detective Butt. Detective Butt was a lead case agent in this case. He testified six or seven different times during this case. He talked about every time there being no discernible structure to this particular group of people. What about the Quinn case? It's even the same community, isn't it? It's sort of a Quad Cities, the case that arose out of the Quad Cities, very similar facts. What do we do with that, or how do you distinguish that, if you can? And I'm glad you asked. So the Quinn and the Green case are two cases that have recently come before this court, and we can distinguish our case from those cases. In Quinn, this court found that there was shared drug trafficking in that case, that members were chosen, that it had nothing to do with where they were born, who they knew, or who they were related to, that they were chosen to be part of this group, and they were chosen because of acts of violence. And if they did not commit acts of violence, they would be excommunicated from the group. The Green case, they talked about selling drugs to get shared money, and that you had to commit acts of violence to get into the gang. Well, let's compare that to C.P.'s testimony, who was a government insider, about what it took to be part of this group. First and foremost, he acknowledged there was no gang. He actually laughed at the notion of 5th Street being a gang. He described it as a bunch of people who grew up on 5th Street who were all kind of doing their own thing. Was there other testimony that it was a gang? Actually, no. Nobody who wasn't law enforcement testified to that. Well, also, there was other testimony that it was. Yeah, from law enforcement. Well, isn't that just a jury decision at that point, then? I don't think so, because what's important is... I understand you're challenging some of the law enforcement testimony also, but setting that issue aside, it seems like if it's admissible, it's sufficient. Well, but what's important is could they support that, and they could not, because every time they are asked why it was a gang... But that's a jury decision, isn't it? You're arguing... It's not. But even then, viewing the evidence in light most favorable to the verdict, this court could still decide that there was not sufficient evidence for the jury to make that determination. And so, really, what we have to look at is what is the testimony? Well, the testimony from Detective Butt was that there was no initiation, no entry into the group, no structure, no leadership, no hierarchy, none of the things we see in Quinn or in Green. As a matter of fact, if you wanted to leave this gang, there was no penalty for that. People came and went as they were free to do. There was no central entity that tied them to that. Well, I mean, I'm looking at my notes here. They had distinct hand signs, distinct what I called or is in my memo as gang tattoos, and you may dispute whether that's gang tattoos, but similar tattoos, social media posts praising each other, disparaging other gangs. There was tribute to dead or deceased members, flashing of gang signs for recognition. I mean, all of that is at least some evidence of that sort of RICO conspiracy, isn't it? I see my time's up. Am I okay to... Please. Okay. Well, I think the same could be said of a lot of different groups who wouldn't even fathom thinking about being RICO conspiracy enterprises. I mean, I grew up in a small town in Iowa, West Branch. We had our own hand signal that we put up to say West Branch. It was a W, right? We wore certain colors because that was our school colors. We associated with each other because we grew up next to each other. So all these things the government point to, you could really take this with any group of people who have hung out since they were kids. They're going to have some different things. My brother has a tattoo on his back that has something to do with West Branch and a couple of kids who died in a car accident. That doesn't make us gang members because we grew up in West Branch. That doesn't make us an enterprise because we grew up in West Branch. That just means that there are identifiable things in our history, in our past, that draw us together. Not making us an enterprise as defined by RICO. I think that's important to distinguish. There's no further questions? Thank you. Thank you. Good morning. May it please the Court. Kyle Hanson on behalf of the United States. Nothing in this case happened in secret. The public throughout the trial had access to the courtroom. Maybe not physically present in the courtroom. However, when we look at the court's precedent on what constitutes a partial or complete closure, the court looks at the interests protected by the public trial, right? But our Thompson case is pretty clear in defining what it means to completely close. And it's not the amount of time. It's who was excluded. And here, at least as I read the briefing, there's really no dispute that no one was allowed in physically to the courtroom during Gwadir. Yeah, and I think the court recognized before that Thompson and Presley and Waller were somewhat a product of their time. And advances in technology and just advances in societal expectations have changed. So is the only way for us to get to a partial closure, the live streaming, do you concede that? That that's what makes this different than Thompson? In a broad sense, however— Because I don't think we've addressed the live streaming issue before, have we? And arguably other circuits have. Maybe they haven't. But the argument is that they have. Correct. The other circuits that have looked at this issue, including the Fourth Circuit in Smith, Fifth Circuit in Ansari, the Sixth Circuit in Hendricks, have all said that live streaming makes any sort of closure a partial closure. And in particular, looking at the Hendricks case from the Sixth Circuit, which was significant in two regards. One is that it was pre-COVID. So it wasn't kind of that world-changing event that inspired the partial closure finding. Instead, it was for protection of an undercover officer who was testifying. But the other distinguishing fact in Hendricks was that it was an audio-only live stream to the auxiliary courtroom. So in this case, we're even better where we have both the audio and the video. So anyone in the overflow can not just listen to what's happening but also see what's happening. And were there multiple cameras that were placed in the courtroom? What was the setup such that—I guess the question is, what did the folks in the spillover room live streaming see? There's no record on that, how many cameras or where they were pointed or anything like that. But to address that, I'd point the court to the Fourth Circuit decision in Smith, where the particular argument there was that the cameras during the live stream that happened throughout the entirety of trial, the cameras did not show a view of the jury. And the Fourth Circuit decided that was of no consequence. Because even if you compare to physical access in the courtroom, there's no guarantee that the public will have any particular line of sight to particular members of the court. And I think I interrupted your answer early in your argument on the purposes for the open trial. And I want to explore that a little bit with the live stream, because if you sort of take as a given that the folks in that extra room can watch what's going on with that jury selection, those folks in the jury selection can't see anybody. Isn't that one of the goals of the open court, such that everyone who is a part of the trial understands the solemnity of it, their responsibility for fairness through the whole process? And if those panel members don't see anybody watching them, that that's also something that the court has considered. Why is that elimination of that factor not really significant here? So that's, as you mentioned, it's part of the consideration. It's not the entire consideration. And that's why I think the Fourth and Fifth Circuits have found that if it's not a complete replacement for actually sitting in the courtroom, it's no more than a partial closure, because looking at the interests being protected, defendant is not being treated unfairly, not proceeding in any sort of a secret manner. Does it matter, though, whether the panel members know that? I think it's a factor that is baked into it. Do you agree that the district court did not let the people who were a part of the jury selection know that there were folks watching them? I did not find a specific mention in the record. However, just in general, we know that as people are filing into the courthouse, the jurors would see other people. But I will agree that there's no specific record of the court telling the jurors that. But, again, when we're looking at whether it's a partial or complete closure, we have to remember that the jury would have seen members of the public throughout the entire rest of the trial, through opening statements, all the evidence, closing arguments. Does that, though, take into account the folks who were being questioned and then were not chosen? In other words, I think that the openness of the jury selection process is certainly, as you say, the 12 folks who were ultimately chosen, but also the other folks who are under an obligation and an oath to tell the truth as to whether or not they might be one of the 12. So I'm not sure that takes you too far, does it? Again, it's not the same as if public is physically present in the courtroom. But, again, we're looking at, is this at most a partial closure? And even though maybe there were not members of the public present for the bigger jury panel, I guess I'll back up. There were members of the public because the jurors, the persecuted jurors themselves, are members of the public. And I think the combination of the parties, the judge, the attorneys, and everybody else who's been called to jury service, that itself is fulfilling that interest in having the jurors be open and honest during their... Can I ask you another, maybe a deeper question about Thompson? And I think your answer was, well, we're kind of in different times. And I think that that's fairly clear that we are. Technology is changing quite rapidly. But is that a grounds for us to not follow the strict rule, the strict statement in Thompson as to what is a partial or a complete closure? Or is that something we would have to sort of tee up and say, look, if the en banc court wants to adjust that definition based on the evolution of technology, okay. But can this panel do it? Yes, I think this panel can do it. And why is that? Because it's not a consideration that was before the court in Thompson, whether live streaming was different. So that panel never ruled that yes or no, live streaming is or is not a partial closure. And then I would just point to the court, the other circuits that before, especially before the pandemic, followed that same dichotomy between just looking at who is excluded from the courtroom to determine partial or complete closure. And Fifth Circuit and Ansari, Fourth Circuit and Smith have made clear that we're adding on to the pre-existing dichotomy with the advances in technology with live streaming. And again, in the sense that Thompson looked at what interests are being protected when determining whether a closure is partial or complete. The same considerations are present here where nothing was done in secret. And the entire time, the public had a window into the courtroom to make sure the defendants were being dealt with fairly. Counsel, is live streaming alone sufficient to create a partial closure as opposed to a complete closure? Or would there have to be other factors involved such as necessity for lack of space or other reasons? In other words, could every court just live stream as a matter of course and still have a constitutionally permitted scenario? So I think it would still be considered a partial closure, but that doesn't mean you can do it in every case. Because even for a partial closure, the court has to have that substantial reason for doing it that way. And those sorts of interests were present in this case. And the court articulated the reasons, the larger than usual number of defendants, the interest in protecting their right to a fair trial by calling more jurors, and the attendant security concerns and not just general security concerns that are present in every case, but the particular ones in this case where we have a pattern of this gang intimidating witnesses and in fact a conviction that arose during the preliminary stages of this case where there was proven perjury in the grand jury because of that gang-related pressure to not cooperate. What about the reasonable alternatives? Assuming that the district court did give reasons that you've described and have discussed here today, but one pretty straightforward one would have been to divide up the veneer panels. And I understand that the district court gave explanations for that, but maybe it's back to my abuse of discretion question. That's not constitutional, the dividing of the veneer. That's more logistical, making sure everybody – I can see the point. If you have everybody together, it's easier to compare juror A to juror Z. But why does that take precedence over the constitutional right to a public trial? Yeah, so I agree that reasonable judges could have handled this situation in a variety of different manners. And the question before the court today is what this particular district court did. Is that totally unreasonable, that no reasonable judge would have followed that course? And if we look at, for instance, Presley, the consideration or that prong of the test is that the court is required to consider reasonable alternatives. It's not required to follow the least restrictive means. Is that not – and I was going to follow up. Do we have to – is it the least restrictive? Isn't that no broader than necessary? I think that's the phrase, right? No broader of a closure than necessary. Isn't – it's hard to piece all of these steps and the analysis together, but that seems to have to play some role. Because in some of the cases it was like, well, there's nothing else they could do. You know, this was based on space and based on number of people. But here we have sort of an obvious answer that's a possibility. I'm just trying to figure out how we assess that when it could have worked. Yeah, and I see that as a separate prong of the test, and maybe there's overlap between those prongs. But for whether this was no broader than necessary, I think that goes to once the court has determined that a closure is justified, that the closure can only exist as long and as broad as needed. And that's what the court did here, is that it faced challenges during the jury selection phase. So it had public access through the overflow courtroom. But then once the jury was picked and space opened up in the courtroom, that's when it no longer was necessary to close, and the court allowed the public to come sit in the primary courtroom. But the court did explain in depth the reasons why it chose the method of accommodating public access that it did. And again, under an abusive discretion standard, even if we can imagine different ways that the court could have done this, what it did was properly considering those alternatives and giving reasonable justifications for the choice it made. Counsel, could you address the application of the attempted first-degree murder guideline? Yeah, on that one, there are two paths the court can follow. One is kind of under 1A, the aiding and abetting alternative. And for aiding and abetting, we need to show that there was an act in furtherance of the offense and a purpose of facilitating the offense. And with that, we have an inference that the finder of fact can draw that if the person did not withdraw from the act, but instead, like in this case, he jumped back in the car with the people involved in the shooting, that shows his previous knowledge of what was going on and his acceptance and intent to further that. But it's more than just he was present and he ran away with everybody. You have to look at the broader context of what's going on with the gang at this time. Counsel challenged you to point to facts. What facts can you point to? So one really good fact is that they find a total of seven guns in the car, and Houston's DNA is on three of them and a fingerprint on a magazine. And the court drew a reasonable inference from that evidence that Mr. Houston was facilitating the escape from the scene by helping hide the firearms, helping get his fellow gang members away from the scene. So that supports a reasonable inference that he is acting in furtherance of the shooting. And even though I don't think there's any dispute that they did not intend to shoot police officers that night, there was this ongoing climate of, after the Timon-Mayfield homicide, the gang was expecting a retaliatory attack. And because of that, they're constantly checking in with each other. They're all carrying firearms all the time. And just hours before this at Neckers, we have a very clear instance where there is a perceived rival where they attack. So that all contributes to Mr. Houston's prior knowledge of what's going on. But then I would also direct the court to kind of the second path on that cross-reference, which is the recently foreseeable acts in furtherance of jointly undertaken criminal activity. And that, I would submit, is maybe a better fit if the court has concerns about the aiding and abetting, that it's very clear that everyone in the gang anticipated the retaliatory shooting. They're preparing for it. And what happened here is something that a person in Mr. Houston's position would have recognized as a possibility. I wanted to briefly address the elements or the sufficiency of the enterprise element of this case. And to be clear, Crenshaw is no longer good law. And it took a while for the district court to come around to that. And I think it's because Green came out kind of in the middle of this. But by the time of the motion, the ruling on the motion for new trial, the court says it's now confident that that extra element about a distinct structure is no longer required. And that's the correct ruling. And one place we depart from the district court motion for new trial ruling is the law of the case analysis, that if the jury received an erroneous instruction, that that somehow elevated what the government had to prove in order to sustain a sufficiency challenge. And that's just no longer true after the Musacchio case from the Supreme Court in 2016, where they made clear the burden for the government and the due process protection for the defendants is defined by what the law requires the government to prove and not kind of a phantom element that is erroneously added to the instructions. And that applies whether the government objected or not. And in this case, to be clear, the government continuously objected to including that erroneous Crenshaw element. But even if that is an element that we had to prove here, we did it with very strong evidence. This is not just a group of people who happen to grow up in the same area and are committing unconnected crimes. This is a group that has an identifiable brand. They have names. They have tattoos. They have a gang sign. They have structure in the sense that they have shared expectations. But not organized, not an organized structure. It is not organized like a corporation. And in Boyle, the court made clear you don't need a name. You don't need written rules. You don't need a clear hierarchy. Like even in Quinn, there was some talk of initiation and choice of who could come in and who could not. Wasn't that kind of a break-off group? So there was a little bit more of a, well, structure, I guess, in terms of who we're going to allow into this organization and who not. I'm not sure that was here, was it? I think it was. The reason why is if you look at who their ops are, if somebody down on 14 1⁄2th Street wanted to join 5th Street, that would be a no-go. I mean, 5th Street has opposing groups for a reason. It's because they are a cohesive group themselves, and they are fighting the ops, and that's one of their shared expectations is to commit acts of violence against the opposing gangs. So looking at the totality of the evidence, the jury reached a reasonable verdict on the enterprise. So for those reasons, the government asked that the court affirm. We certainly went along with the appellants. I'll look to see if there are any other questions. Thank you for your argument. Rebuttal. The court would permit us to switch who's giving the rebuttal based on the questionings, Your Honor. Thank you. Thompson has four factors. The overriding interest. There was no overriding interest. There was nothing that was going to be prejudiced by having an open courtroom. There were not any other considerations. There was no need to do it. The government in their brief at page 48 says this occurred due to a convergence of three factors. The first one that the government cites from the district court's ruling is that, quote, the need to find space in the courtroom for all five defendants and their counsel. That is a traditional, clear, logical error, because that begs the question, were all five defendants and their counsel required? They were not, because it could have been severed. It could have been severed into smaller trials. The other trials that proceeded that you're hearing after this one were in smaller panels. And do you know what they had? An open voir dire. So the idea that the need to find space in the courtroom allows a closure because of the number of defendants begs that question. And the answer to that is no. You don't need to have all of those defendants together. And if you cannot accommodate an open trial, then you need to sever. And that is one of the places where the judge abused his discretion in not further severing, because severance is not of constitutional concern. They don't have a constitutional right. The government doesn't have a constitutional right to try them all together. But the defendants each have a constitutional right to be tried openly and publicly. And if the government wants to have indictments with 20 or 30 people on them, that's fine. They're allowed to do so. But then that does not mean that they get to have them all tried together if it can't be done in a way that comports with the Constitution. And that's what happened here. The trial ended up not comporting with the Constitution because it was closed. And that is the most important takeaway. We know it was possible. We know from the record it was possible to have an open courtroom because we did it for three weeks of trial. We know it was possible to have an open voir dire for the men on this indictment because we did it for two other trials. The government wants to go down a road that says, well, as technology changes, so too does the Constitution. I don't think that's a road we should go down, and I don't think that's a road that the Constitution commands us to go down. Are we going to come to a point where everything is public and we're all sitting on Zoom to have complete trials? Would that have been public? I don't think it would. And that's ultimately the stretch that the government is trying to make because this was a full closure because everyone was excluded. And the only saving grace the government has is the suggestion that a live stream cures that. But the Constitution does not yield to technology. It does not yield to convenience. It does not yield to anything in this country. And it says a trial must be open. And for those reasons, this court should remand for a new trial that is open from voir dire to verdict. Thank you, Your Honor. Thank you, counsel. Thank you to all counsel who have participated in the argument and the briefing in this case. Very interesting, very serious issues, and we will take the matters under advisement.